Below is an Opinion of the Court.

ELIZABETH PERRIS
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

In Re:                                    ) Bankruptcy Case No.
                                          ) 10-38478-elp13
DAVID REED and REBECCA REED,              )
                                          )
                    Debtors.              ) MEMORANDUM OPINION
                                          )
_____ )

In this chapter 13[1] case, debtors, whose family income exceeds the applicable median income for their family size, seek to confirm a plan that pays nothing to unsecured creditors and lasts only 43 months. The chapter 13 trustee objects to confirmation on two bases: that the plan is required to, but does not, last five years and that the plan does not, according to the trustee, commit all of debtors' projected disposable income to payments under the plan. The issues are how to calculate projected disposable income, and whether recent Supreme Court opinions have effectively overruled the Ninth Circuit's decision about the required length of a plan for an above-median-income debtor with negative

---

[1] All references to chapters and sections in this opinion are to the Bankruptcy Code, 11 U.S.C. § 101 et seq.

Page 1 - MEMORANDUM OPINION

projected disposable income.

Taking into account the evidence presented at the hearings on this matter, as well as the arguments of the parties, I conclude that debtors' projected disposable income is less than zero, and that, under controlling Ninth Circuit precedent, they are not required to commit to a five-year plan period. Debtors' plan as proposed will be confirmed.

FACTS[2]

Debtors David and Rebecca Reed are both employed. Mr. Reed has been employed by the same employer for 38 years. His income fluctuates based on the number of hours worked per pay period. During the twelve-month period of March 2010 through February 2011, his average monthly income was $6,611.26. He does not anticipate any changes in income.

Mrs. Reed has worked at the same job for 13 years. She received a raise in June 2010 and does not anticipate any changes in her income. Her salary is $4,500 per month. She received a bonus of $8,500 in early 2010, and a $469.80 bonus in her February 10, 2011, paycheck. Debtors represent in their Second Amended Schedule I that Mrs. Reed's average net bonus, received once a year, is $22.08 per month.

At the time they filed bankruptcy, debtors had been receiving monthly adoption assistance payments. Those payments were to end after June 2011.[3]

---

[2]    The facts are taken from the Stipulated Facts submitted by the parties, debtors' Second Amended Schedule I (which the parties agreed could be taken into account), and the evidence presented at the hearing on April 14, 2011.

[3]    Debtors report a monthly contribution from their daughter of
(continued...)

Page 2 -  MEMORANDUM OPINION

As required, debtors filed an Official Form B22C, the "Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income." The income amounts reported on this form, as required by statute, are derived from the average monthly income of the debtors from the six calendar months preceding bankruptcy. Those amounts are $6,720.55 for Mr. Reed, made up of $6,188.05 in wages plus $532.50 in adoption assistance, and $4,335.56 for Mrs. Reed. The couple's total monthly income reflected on the Form B22C, based on the six months before bankruptcy, is $11,056.11. Their annualized current monthly income reflected in the form is $132,673.32, which is above the applicable median family income of $62,608.

The Form B22C includes a calculation of deductions from income, resulting in a "monthly disposable income." Because debtors' income exceeds the applicable median family income, they are required to use Internal Revenue Service ("IRS") standards for many of their expenses, such as food, housing, and vehicle ownership and operation costs. The expenses debtors report in their Form B22C total $11,726.63, leaving a monthly disposable income of a negative $670.52.

Debtors propose a 43-month plan with payments beginning at $1,300 per month and stepping up to $2,032 after 28 months. They are able to propose to make payments into the plan, despite the negative monthly disposable income reflected in the Form B22C, because the income

---

[3](...continued)
$361 for a vehicle on which they make the payments. The trustee acknowledged that the income is essentially offset by the expense of the vehicle, making it a wash. Therefore, I do not consider either the income or the expense of the vehicle in making my determination.

Page 3 – MEMORANDUM OPINION

projected in their Schedule I is more than the income shown in the Form B22C (based as it is on the six months before bankruptcy) and their actual expenses are less than the amounts allowed by the IRS standards.

The plan payments will result in a zero dividend to unsecured creditors. If debtors were to make the monthly payments proposed in the plan for a full 60 months, the dividend to unsecured creditors would be $36,758.63, approximately 61 percent of the filed general unsecured claims of $59,305.03. The trustee objects to confirmation of the plan, arguing that debtors should be required to continue their proposed plan payments for five years.

PARTIES' ARGUMENTS AND BACKGROUND

1. <u>Summary of Arguments</u>

Debtors argue that, because the monthly disposable income shown on their Form B22C is less than zero, they are not required to extend their plan for 60 months. Instead, they argue for confirmation of a plan that will be completed after 43 months and will pay nothing to unsecured creditors.

The trustee argues that, using a forward-looking approach to calculating projected disposable income based primarily on debtors' Schedules I and J, debtors have more than zero projected disposable income. Even if debtors' projected disposable income is a negative number, however, he argues that debtors should nonetheless be required to make their plan payments for 60 months, resulting in a substantial dividend to unsecured creditors.

2. <u>Legal Background</u>

Chapter 13 allows individuals with "regular income" to make payments

Page 4 – MEMORANDUM OPINION

over time and receive a discharge at the conclusion of the plan payments.
If the trustee or a creditor objects to confirmation of a plan that does
not provide for payment in full to unsecured creditors, the court may not
confirm the plan unless it provides "that all of the debtor's projected
disposable income to be received in the applicable commitment period
. . . will be applied to make payments to unsecured creditors under the
plan." § 1325(b)(1)(B).

For debtors whose current monthly income exceeds the median income
for the debtor's family size, "disposable income" is calculated according
to the means test set out in § 707(b)(2). § 1325(b)(2), (3). This test
starts with the debtor's historical average monthly income for the six
months before bankruptcy, and deducts amounts for "reasonably necessary"
expenses. § 1325(b)(2). What expenses are "reasonably necessary" are
determined in large part using standards specified by the IRS.
§§ 707(b)(2), 1325(b)(3).

"Disposable income" as determined under the means test is then
projected over the plan's "applicable commitment period." The
"applicable commitment period" for above-median debtors who are not
paying unsecured creditors in full is "not less than 5 years[.]"
§ 1325(b)(4)(A)(ii).

The questions of how to project disposable income and what
"applicable commitment period" is used when an above-median debtor has
zero or negative projected disposable income have vexed debtors,
trustees, and the courts since amendment of the statutory definition of
"disposable income" in the Bankruptcy Abuse Prevention and Consumer
Protection Act of 2005 ("BAPCPA"). In 2008, the Ninth Circuit answered

both of those questions for this circuit in <u>In re Kagenveama</u>, 541 F.3d 868 (9th Cir. 2008).

First, the court held that projected disposable income should be determined by what has been called a mechanical approach, by simply determining monthly disposable income using the statutory formula set out in § 1325(b)(2), then multiplying ("projecting") that number by the number of months in the plan. This approach does not take into account any changes in income or expenses from the income and expenses used under the formula.

Second, the court held that, when a debtor has no (or negative) projected disposable income as calculated using the mechanical approach, there is no "applicable commitment period" for the debtor's plan, so the plan need not last a full five years.

In 2010, the Supreme Court decided <u>Hamilton v. Lanning</u>, 130 S.Ct. 2464 (2010), which effectively overruled the mechanical approach <u>Kagenveama</u> had adopted for calculating projected disposable income. The Court held that "projecting" disposable income is a forward-looking concept, so a court may take into account changes in a debtor's income or expenses from those used in the means test, provided that the changes are known or virtually certain to occur. Ordinarily, the monthly disposable income as calculated under the statutory formula (using the Form B22C) will be the disposable income that is projected through the life of the plan. In unusual circumstances, however, the court has discretion to consider changes in income or expenses that are known or virtually certain. This approach allows a projection into the future that is forward-looking rather than mechanical.

Page 6 - MEMORANDUM OPINION

The Supreme Court addressed another means-test issue for purposes of chapter 13 in <u>Ransom v. FIA Card Services, N.A.</u>, 131 S.Ct. 716 (2011). In that case, the question was whether, under the formula for calculating monthly expenses pursuant to § 1325(b)(3)(A), a debtor who owns a car but does not have car loan or lease payments can claim an allowance for car ownership costs. The Court concluded that the car ownership allowance could be claimed only if a debtor has either a car loan or lease payment.

Both <u>Lanning</u> and <u>Ransom</u> rely in part on what the Court viewed as a purpose of Congress in enacting the BAPCPA means test: to assure that debtors who can pay creditors do so.

ISSUES

This case raises two questions. First, how should projected disposable income be calculated under the Supreme Court's forward-looking approach as set out in <u>Lanning</u>? Second, did the Supreme Court decisions in <u>Lanning</u> and <u>Ransom</u> effectively overrule the <u>Kagenveama</u> holding that there is no "applicable commitment period" for above-median debtors who have no, or negative, projected disposable income?

DISCUSSION

1. <u>Projected disposable income</u>

As I explained above, the Supreme Court in <u>Lanning</u> held that, in determining projected monthly disposable income, the court "should begin by calculating disposable income," which by statute uses the income received in the six months before bankruptcy and, for above-median-income debtors, IRS standards for expenses. 130 S.Ct. at 2475. In most cases, the Court said, "nothing more is required." However, "in unusual cases . . . a court may go further and take into account other known or

Page 7 – MEMORANDUM OPINION

virtually certain information about the debtor's future income or expenses." Id. Thus, "when a bankruptcy court calculates a debtor's projected disposable income, the court may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation." Id. at 2478.

Using this approach, the starting point is the debtors' Form B22C, which reflects both historical income and applicable IRS expenses, some of which are standardized amounts. In most cases, the monthly disposable income reflected in that form will be multiplied by the applicable commitment period to calculate projected disposable income. However, and only "in 'unusual cases,' where there is evidence of impending changes to a debtor's income or expenses that are 'known or virtually certain' to occur, the bankruptcy court may adjust the results of the mechanical approach in fixing the debtor's projected disposable income." In re Henderson, 2011 WL 1467934, *5 (Bankr. D. Idaho 2011) (footnote omitted).

This does not mean that the court merely looks at the debtor's Schedules I and J, which estimate actual or projected monthly income and expenses at the time the case is filed, to determine the debtor's projected disposable income. "Disposable income" is a statutory term and is calculated according to a strict statutory formula, as reflected in the Form B22C. § 1325(b)(2). The amount shown in the Form B22C as monthly disposable income is presumed to be correct. Only in unusual cases where there are changes that are known or virtually certain to occur will the disposable income as calculated in the Form B22C be adjusted before projecting over the plan period.

When the trustee seeks to rebut the presumption that the monthly

Page 8 - MEMORANDUM OPINION

disposable income shown in the Form B22C accurately reflects a debtor's projected disposable income, the trustee bears the initial burden to present evidence that the amounts used in the form do not adequately predict the debtor's disposable income into the future.  See 2 Barry Russell, Bankruptcy Evidence Manual § 301:76 at 369 (2010-2011 ed.); In re Ries, 377 B.R. 777, 787 (Bankr. D.N.H. 2007).  However, once the trustee makes an initial showing, debtors as proponents of the plan have the burden to show that the plan complies with all of the requirements for confirmation.  In re Hill, 268 B.R. 548, 552 (9th Cir. BAP 2001); Russell, § 301:76 at 366.

Thus, although Schedules I and J are evidence of a debtor's income and expenses, differences between the numbers on the Form B22C and those on the Schedules I and J do not by themselves establish a change in income or expenses that is known or virtually certain to occur. Differences may be a result of, among other things, errors (in which case the errors should be corrected), the inclusion in Schedule I of income that is excluded from the calculation of "current monthly income" as defined in § 101(10A), a change in employment status, the use of IRS standardized expense figures on the Form B22C (as opposed to actual expenses on the Schedule J), or the use of different periods of time for the calculations used for the different forms.  Differences may or may not indicate changes that are known or virtually certain and that may be used to more accurately project the debtor's disposable income over the life of the plan.  The trustee cannot rely solely on the Schedules I and J to show that the monthly disposable income shown on the Form B22C should be adjusted to accurately project disposable income into the

future.  There must be evidence that the differences reflect predictable known or virtually certain changes.

For example, as in <u>Lanning</u>, the income included in the Form B22C may include a one-time lump sum payment that skews the average income shown on the form.  Other possibilities that come to mind, and are by no means intended to be comprehensive, are bonuses received annually that are certain but are not included in the Form B22C because of timing issues, recent salary raises, or seasonality that predictably results in income differences at different times of the year.  Similarly, it might be appropriate to adjust standardized expenses if there is some known or virtually certain change that would affect the application of the standardized expenses, such as a change in family size.  Where actual expenses are used in the Form B22C, those expenses should not be adjusted unless the trustee shows that changes in those expenses are known or virtually certain.  Merely showing fluctuations over time or different amounts on the Schedule I or J is not enough.[4]

The trustee's arguments in this case fail to recognize the need for changes from the income and expenses used for the Form B22C to be known or virtually certain to occur.  The use of the means test standardized expenses inevitably results in differences between the debtors' likely expenses (Schedule J) and those used on the Form B22C.  <u>Lanning</u> allows departure from the current monthly income and the standardized and actual expenses only when changes affecting income or allowable expenses are

---

[4]    Some of the actual expenses used in the Form B22C and in the Schedule J should correspond.  If they do not, the trustee can inquire and, if it appears that the differences reflect known or virtually certain changes, the trustee can object to confirmation.

Page 10 - MEMORANDUM OPINION

known or virtually certain.

The trustee relies on <u>In re Mullen</u>, 369 B.R. 25 (Bankr. D. Or. 2007), in which Judge Dunn found that the presumption that the Form B22C calculation of disposable income should be used to project disposable income was rebutted by the debtors' proposal to pay more than three times that amount into their plan. He concluded that their proposed periodic plan payment rebutted the presumption that the amount from Form B22C should determine projected disposable income.

After <u>Lanning</u>, I conclude that the mere fact that a debtor's Schedules I and J show a positive net monthly income or that a debtor proposes payments under the plan that exceed the disposable income number on Form B22C is not sufficient alone to allow deviation from the Form B22C disposable income in calculating projected disposable income. There must be evidence of changes (as compared to the Form B22C) that are known or virtually certain in either income or expenses.

In this case, there are changes to debtors' income from that reflected in the Form B22C that are known or virtually certain to occur, so an adjustment may be made to debtors' income.

First, Mrs. Reed got a raise in June 2010 and now receives a salary of $4,500 per month, with no anticipated raises in the future. Debtors did not include any amount on the Form B22C for bonuses for Mrs. Reed, because she did not receive a bonus during the six calendar months before bankruptcy. However, on their Second Amended Schedule I, debtors report that Mrs. Reed expects to receive an annual bonus that will increase their monthly income by $22.08. The raise in salary and the annual bonus are changes from the amounts used in the Form B22C that are known or

Page 11 - MEMORANDUM OPINION

virtually certain. I will adjust the $4,335.56 in monthly income shown in the Form B22C for Mrs. Reed to the $4,500.00 salary and the $22.08 bonus that she reports in the Second Amended Schedule I, for a total of $4,522.08. Therefore, Mrs. Reed's income is $186.52 per month more than is shown in the Form B22C.

There is no basis for adjusting Mr. Reed's income. The evidence established that his monthly income fluctuates throughout the year, and that his average salary over the twelve months preceding the filing of the Second Amended Schedule I was $6,611.26. This is more than his average monthly income in the six months before bankruptcy, which was $6,188.05. However, there is no evidence that this difference reflects a change in Mr. Reed's anticipated income, seasonality in his income, or exclusions of a period in which he regularly receives a bonus. It reflects only a difference between the fluctuating income received in the six months before bankruptcy and that received over the twelve months before debtors filed their Second Amended Schedule I. Because there is no change in his income, but only different calculations depending on what period of time is used, the trustee has not established a known or virtually certain change in Mr. Reed's income that should be used to adjust debtors' disposable income calculation.[5]

Second, debtors include in their Form B22C and their Second Amended Schedule I a monthly adoption assistance payment. That payment was reported as $532.50 in the Form B22C and $639 in the Second Amended

_____

[5]    Even if one used Mr. Reed's average income for the twelve months before the Second Amended Schedule I instead of the six months before bankruptcy, debtors would still have negative projected disposable income.

Page 12 - MEMORANDUM OPINION

Schedule I. It is undisputed that the adoption assistance payment was to terminate after June 2011. That is a change that is known or virtually certain to occur, and the adoption assistance payment should not be included in projecting debtors' disposable income into the future.

Based on these changes in income that are known or virtually certain to occur, the monthly income reflected on line 11 of debtors' Form B22C of $11,056.11 should be adjusted to $10,710.13 ($6,188.05 for Mr. Reed plus $4,522.08 for Mrs. Reed), for a reduction from the income reflected in the Form B22C of $345.98 per month.

On the expense side, the trustee argues that changes should be made to the expenses shown on the Form B22C, which would result in positive monthly disposable income. The trustee points out five errors on the Form B22C. Debtors do not dispute the alleged errors. The errors are:

1. Line 28b: Debtors erroneously include car payments for two cars, when they should include only one. The correct amount is $610.51 (as shown on Line 47), not $955.51. This does not result in any change in the deductions from income.

2. Line 29b: Debtors erroneously omitted the second car payment. The correct amount is $345 (as shown on Line 47), not zero. This results in a deduction from income of $151, not the $496 claimed by debtors, for a reduction in expenses of $345.

3. Line 47b: The payment on the computer should be projected over 60 months, or $1.67 per month rather than the $53.89 listed in debtor's Form B22C. This reduces the expenses by $52.22.

4. Line 49: Priority claim payments should be $99.45, based on priority claims filed, not $123.94 as projected by debtors, for a

Page 13 - MEMORANDUM OPINION

reduction in expenses of $24.49.

5. Line 50c: The trustee correctly points out that administrative expenses should be $188.83, not $130 as shown in the Form B22C, for an increase in expenses of $58.83.

Correcting for these errors is appropriate and results in a $362.88 reduction in expense deductions.

The trustee advocates that there are four other expense changes that should be made based either on the Second Amended Schedule I or debtors' pay stubs:

| B22C Line | Description | B22C Amount | Trustee Amount | Impact on Expenses |
|---|---|---|---|---|
| 30 | Taxes - Second Amended Sch. I | 2686.28 | 2436.72 | < 249.56> |
| | Alternative - Pay stubs | | 1851.48 | < 834.80> |
| 31 | Mandatory employment deductions - 2nd Am Sch I | 252.09 | 145.36 | < 106.73> |
| | Alternative - Pay stubs | | 134.70 | < 117.39> |
| 39a | Health insurance (2nd Am Sch I) | 404.80 | 62.00 | < 342.80> |
| 55 | Retirement deduction (2nd Am Sch I) | 470.04 | 606.12 | 136.08 |

I conclude that none of these four adjustments to expenses should be made. There is no evidence that the differences in taxes (line 30) or retirement (line 55) result from known or virtually certain changes rather than simple fluctuations in income.

As to the mandatory employment deductions and health insurance (lines 31 and 39a), the pay stubs submitted as Exhibits E-7 - E-16 raise questions about whether the amounts included on lines 4.b. and 4.c. on the Second Amended Schedule I are accurate. For example, Exhibits E-8

Page 14 - MEMORANDUM OPINION

and E-10 each show a $202.90 medical insurance expense for Mr. Reed, not $0 as reported on line 4.b. of the Second Amended Schedule I. Because it appears that these amounts in debtors' Second Amended Schedule I may be mistakes, the trustee has not shown known or virtually certain changes in the amounts reported as deductions on lines 31 and 39a.

Based on the adjustments to expense deductions to correct errors, the monthly deductions reflected on line 58 of debtors' Form B22C of $11,726.63 should be adjusted to $11,363.75 ($11,726.63 less $362.88).

Thus, debtors' projected disposable income, even taking into account changes in income that are known or virtually certain to occur and correcting errors in expenses, is less than zero. Using the projected monthly income ($10,710.13) and the projected expenses ($11,363.75) discussed above, debtors' projected monthly disposable income is a negative $653.62.

Although debtors acknowledge that they actually have net income that they can use to make payments under the plan, the use of the means test required by the Bankruptcy Code leaves them with no projected disposable income as that term is used in the statute.

This difference between actual expenses and those used in the means test is unsurprising, and may lead at times to unjust results. As Judge Pappas explained in a similar case, because the expenses used to calculate disposable income in the Form B22C "are derived primarily from IRS National and Local Standards[,] . . . only rarely will debtors' actual expenses match their Form 22C expenses." <u>Henderson</u>, 2011 WL 1467934 at *5 n.9. <u>See also</u> <u>Ransom</u>, 131 S.Ct. at 729 ("this kind of oddity is the inevitable result of a standardized formula like the means

Page 15 - MEMORANDUM OPINION

test . . . [which is by its] nature over- and under-inclusive.").

2.  _Applicable commitment period_

    Because I have concluded that debtors have no projected disposable income, I must address the trustee's second argument, which is that debtors' applicable commitment period for their plan is five years.

    Where as here there is an objection to confirmation, § 1325(b)(1)(B) requires a debtor's plan to provide that all of his or her projected disposable income to be received in the applicable commitment period be devoted to payments to unsecured creditors under the plan. For debtors with income above the median, the applicable commitment period is five years. § 1325(b)(4)(A)(ii).

    In Kagenveama, however, the court held that, when a debtor has zero or negative projected disposable income, "there is no 'applicable commitment period.'" 541 F.3d at 876. Debtors rely on the holding in Kagenveama to argue that they do not need to propose a five-year plan. The trustee argues that this holding has been effectively overruled by Lanning and Ransom, so debtors must propose a five-year plan.

    Once the Ninth Circuit "resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court." Hart v. Massanari, 266 F.3d 1155, 1171 (9th Cir. 2001). The court's decision "binds all courts within a particular circuit[.]" Id. "[C]ircuit precedent, authoritative at the time that it issued, can be effectively overruled by subsequent Supreme Court decisions that 'are closely on point,' even though those decisions do not expressly overrule the prior circuit precedent." Miller v. Gammie, 335 F.3d 889, 899 (9th Cir. 2003) (en banc).

> [T]he issues decided by the higher court need not be identical in order to be controlling.  Rather, the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable.

Id. at 900.

Thus, the question is whether the Supreme Court has effectively overruled Kagenveama on the issue of whether an above-median debtor with zero or negative projected disposable income has an "applicable commitment period" for a chapter 13 plan.

In a recent opinion, the Idaho Bankruptcy Court addressed this issue and concluded that the Supreme Court did not effectively overrule the portion of Kagenveama dealing with applicable commitment period. Henderson, 2011 WL 1467934.  In an extensive discussion, the court reasoned that both Lanning and Ransom addressed means-test issues, looking at the purpose of the means test in doing so.  The court noted, however, that neither decision dealt with the interpretation of the applicable commitment period for above-median debtors who have no projected disposable income.[6]

I agree with the Idaho court's conclusion that the ruling in Kagenveama relating to applicable commitment period has not been overruled by later Supreme Court decisions.  However, I conclude that I

---

[6]  In Henderson, the court said that the Supreme Court's use of the purpose of the means test in its analysis of means test questions does not preclude a court from "considering BAPCPA's general purpose of ensuring a fairer bankruptcy system for creditors and debtors alike" when interpreting some other BAPCPA provision.  2011 WL 1467934, at *7.  The court then considered the purpose of BAPCPA as a whole, and concluded that the Ninth Circuit's applicable commitment period holding in Kagenveama "is consonant with the particular purpose of § 1325(b)(1), and the general goals of BAPCPA as a whole."  Id. at *10.

Page 17 - MEMORANDUM OPINION

need to decide only whether the Supreme Court has overruled precedent that I am otherwise required to follow, not whether <u>Kagenveama</u> is consonant with the purposes of the statute. Because I conclude that neither <u>Lanning</u> nor <u>Ransom</u> effectively overruled the applicable commitment period analysis in <u>Kagenveama</u>, I am bound to follow the Ninth Circuit's precedent on that issue.

In <u>Lanning</u>, the Supreme Court disagreed with the Ninth Circuit's interpretation of the term "projected disposable income" in § 1325(b)(1). In that context, the Supreme Court considered the ordinary meaning of "projected," and also looked at pre-BAPCPA case law and practice. Because the term "projected disposable income" had not changed with BAPCPA, the Court did not see a reason to depart from prior practice absent a clear indication that Congress intended such a change. 130 S.Ct. at 2473-2474. The Court also viewed the mechanical, multiplier approach as clashing with other parts of § 1325, in particular the requirement that a debtor pay into the plan "projected disposable income 'to be received'" during the plan period. <u>Id.</u> at 2474.

In <u>Ransom</u>, the Supreme Court addressed another means-test issue for purposes of chapter 13 -- whether, under the formula for calculating monthly expenses under the means test pursuant to § 1325(b)(3)(A), a debtor who owns a car but does not have car loan or lease payments can claim an allowance for car ownership costs. Under the means test, which is set out in § 707(b)(2)(A), monthly expenses are "the debtor's applicable monthly expense amounts" set out in the standards the IRS uses to calculate the amounts taxpayers are able to pay on overdue taxes. The question in <u>Ransom</u> was the meaning of "applicable" as applied to "monthly

Page 18 - MEMORANDUM OPINION

expense amounts."

The Supreme Court looked at the ordinary meaning of "applicable," which is defined as "appropriate," and said that a deduction is appropriate only if the debtor actually will incur that type of expense during the life of the plan. <u>Ransom</u>, 131 S.Ct. at 724. The Court said that this reading of "applicable" is supported by the statutory context. An expense is not "reasonably necessary," the Court said, if the debtor does not have that type of expense. <u>Id.</u> at 724-725.

Finally, and most important for our purposes, the Court considered the purpose of the means test set out in BAPCPA, which it identified as "to ensure that [debtors] repay creditors the maximum they can afford." <u>Id.</u> at 725, quoting H.R.Rep. No. 109-31, pt.1, p.2 (2005). In rejecting the debtor's interpretation of the statutory language, the Court was concerned that the debtor's reading "would sever the connection between the means test and the statutory provision it is meant to implement--the authorization of an allowance for (but only for) 'reasonably necessary' expenses." <u>Id.</u> at 727. It would also, in the Court's view, "run counter to the statute's overall purpose of ensuring that debtors repay creditors to the extent they can[.]" <u>Id.</u>

The trustee in this case argues that the Supreme Court's reasoning in <u>Lanning</u> and <u>Ransom</u> has effectively overruled the <u>Kagenveama</u> ruling that there is no "applicable commitment period" if an above-median debtor has no projected disposable income. According to the trustee, because both <u>Lanning</u> and <u>Ransom</u> rely in part on what the Court viewed as a purpose of Congress to assure that debtors who can pay creditors do so, the Court has effectively rejected the Ninth Circuit's interpretation of

Page 19 - MEMORANDUM OPINION

the Bankruptcy Code that allows debtors to pay nothing to unsecured creditors when they have the means to make those payments.

I disagree with the trustee. _Lanning_ and _Ransom_ addressed different issues relating to the means test: how disposable income is projected and what expenses are allowable. The surviving part of _Kagenveama_, on the other hand, is its interpretation of "applicable commitment period." The statutory language of the provisions considered in the Supreme Court means-test cases is different from the statutory language at issue in the applicable commitment period portion of _Kagenveama_.

In _Kagenveama_, the circuit noted that § 1325(b)(4), which sets out the applicable commitment period for below- and above-median debtors, is exclusively linked to § 1325(b)(1)(B), which requires a debtor to pay all of his or her "projected disposable income to be received in the applicable commitment period" into the plan. "[O]nly 'projected disposable income' is subject to the 'applicable commitment period' requirement." 541 F.3d at 876. Money other than projected disposable income "does not have to be paid out over the 'applicable commitment period.'" _Id._

Essentially, the Ninth Circuit in _Kagenveama_ relied on what it viewed as "the plain language of the Bankruptcy Code as written." _Id._ at 877. Because the applicable commitment period applies only to payment of projected disposable income, there is no requirement that voluntary payments that are not "projected disposable income" be paid for five years. _Id._

It is clear that the Supreme Court rejected part of the reasoning used by the Ninth Circuit in _Kagenveama_. _Kagenveama_ said that the only

Page 20 - MEMORANDUM OPINION

purpose of § 1325(b)(2), relating to "disposable income," and 1325(b)(3), "amounts necessary to be expended," was to "define terms relevant to the subsection (b)(1)(B) calculation." 541 F.3d at 876. The Supreme Court in Lanning dismissed this argument as it related to projected disposable income, saying that it

> overlooks the important role that the statutory formula for calculating "disposable income" plays under the forward-looking approach. As the Tenth Circuit recognized in this case, a court taking the forward-looking approach [for determining "projected disposable income"] should begin by calculating disposable income, and in most cases, nothing more is required. It is only in unusual cases that a court may go further and take into account other known or virtually certain information about the debtor's future income or expenses.

130 S.Ct. at 2475.

The Court did not, however, reject the use of "plain meaning" analysis, and in fact relied on what it saw as the plain meaning of the term "projected" to include foreseeable circumstances that were known or virtually certain to affect the debtor's income or expenses.

It also, as did the Ninth Circuit in Kagenveama, looked at statutory context to determine what Congress intended by the phrase "projected disposable income."

The question here is not whether I think that, if the Supreme Court were to consider and rule on the meaning of "applicable commitment period" for above-median debtors with zero or negative projected disposable income, it would come to the same conclusion as the Ninth Circuit did in Kagenveama. The question is whether the Supreme Court's decisions in Lanning and Ransom so undercut the reasoning of Kagenveama that the Ninth Circuit's decision on this issue is no longer binding on this court and other lower courts.

Page 21 - MEMORANDUM OPINION

1    At its base, <u>Kagenveama</u> relied on the plain meaning of the statutory

2  terms and their context and relationship to each other.  The Supreme

3  Court neither rejected that approach nor the conclusion that the circuit

4  reached with regard to "applicable commitment period."

5    The trustee argues that both <u>Lanning</u> and <u>Ransom</u> relied on the

6  purpose behind BAPCPA, which was to assure that debtors who could pay

7  creditors did so.  According to the trustee, that purpose is defeated if

8  there is no applicable commitment period for above-median debtors who

9  have no or negative projected disposable income but who can nonetheless

10 propose to make payments under a chapter 13 plan.

11   The Supreme Court did not use the purpose of BAPCPA to override the

12 plain meaning of the statute.  It did not even use the purpose to help

13 decide the meaning of an ambiguous statutory term.  Instead, in both

14 <u>Lanning</u> and <u>Ransom</u>, the Court viewed its interpretation as consistent

15 both with the plain meaning of the statutory terms and with the purpose

16 behind the means test adopted in BAPCPA.  As the court pointed out in the

17 <u>Henderson</u> decision, to the extent the Supreme Court relied on what it

18 viewed as the purpose of the means test, that purpose (assuring that

19 debtors who can repay creditors do so) is more limited than the purpose

20 of BAPCPA as a whole, which was "to produce a fairer system for creditors

21 and debtors."  <u>Henderson</u>, 2011 WL 1467934 at *7.

22   I conclude that the Supreme Court's decisions did not effectively

23 overrule <u>Kagenveama</u>'s holding regarding applicable commitment period.

24 Therefore, I am bound to follow that holding.  Debtor's plan will be

25 confirmed.

26   Finally, I must point out that, even if the trustee were correct

Page 22 - MEMORANDUM OPINION

that the applicable commitment period for above-median-income debtors who have no projected disposable income is five years, such debtors would not necessarily be required to continue paying the proposed monthly plan payment amount for the entire five years. Section 1325(b)(1)(B) requires that a debtor's plan provide "that all of the debtor's projected disposable income to be received in the applicable commitment period" be applied to make payments to unsecured creditors under the plan. Where projected disposable income is zero or less, it is hard to see how the statute requires any payment to unsecured creditors. Zero times 60 months is still zero. Although debtors might be required to remain in chapter 13 for the full 60 months, with the possibility that the plan might be modified "before the completion of payments under" the plan due to changes in circumstances, § 1329(a), it is not clear that the statute requires that any particular amount be paid to unsecured creditors. <u>See</u> <u>Baud v. Carroll</u>, 634 F.3d 327, 353-357 (6th Cir. 2011).

CONCLUSION

Debtors have income above the applicable median income, but have negative projected disposable income. The Ninth Circuit's decision in <u>Kagenveama</u> with regard to applicable commitment period for such debtors has not been effectively overruled by the Supreme Court's decisions in <u>Lanning</u> and <u>Ransom</u>. Therefore, debtors' plan, which proposes a 43-month plan that pays less than 100 percent to unsecured creditors, will be confirmed. Debtors should submit their order confirming plan.

###

cc:  Wayne Godare
     Brian D. Turner


Page 23 - MEMORANDUM OPINION